IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| LOVEYMAE GALARIO, individually and as Next Friend of J.K.G., a minor born October 9, 1998, and JALYN LIKE, | ) ) ) ) ) | Civ. No. 07-00159 DAE-KSC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| AYOTUNDE ADEWUNDMI, PEGGY HILTON, LILLIAN KOLLER, STATE OF HAWAII, DEPARTMENT OF HUMAN SERVICES, CHILD AND PROTECTIVE SERVICES, and DOES 1-10, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART
STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

On April 27, 2009, the Court heard Defendants' Motion for Summary

Judgment.  Steven. D. Strauss, Esq., appeared at the hearing on behalf of Plaintiffs;

John S. Cregor, Jr., Esq., appeared at the hearing on behalf of Defendants.  After

reviewing the motion and the supporting and opposing memoranda, the Court

GRANTS IN PART AND DENIES IN PART Defendants' Motion.

BACKGROUND

This case arises out of an intervention and removal of a minor child, JKG, by the State of Hawaii Department of Human Services ("DHS"), Child Welfare Services ("CPS"). JKG was born on October 9, 1997 and had been a foster child of Plaintiff Loveymae Galario until Galario adopted her in December 2003. At various times, Plaintiff Jalyn Like, another licensed foster parent, resided with Galario and JKG. This combined household involved the care of a total of 10 children, six of whom were foster children.

On November 23, 2004, CPS received a "mandated reporter" pursuant to Haw. Rev. Stat. 350.1.1 from JKG's elementary school alleging physical abuse to JKG by her mother. According to the report, JKG "had bruises across [the] bridge of [her] nose and right side of [her] face with a few open wounds." (Mot. Ex. A at 3.) The report also conveyed that JKG had said "Mommy hates me" and that her mother had punched her because she didn't want to go to school. (Id.) The report recommended protective custody because of JKG's expression of fear at the thought of going home. (Id.)

As a result, CPS social worker Ayotunde Adewundmi interviewed JKG. In that interview, JKG referred to Like as "mother," not Galario, and stated that Like hit her in the face because she did not want to go to school. According to

2

Like's declaration, JKG also made statements to Adewundmi at this interview that conflict with her original story.  (Opp'n Like Decl. at ¶ 8.)  Like claims that Adewundmi later testified in Family Court that JKG had provided various other stories, including: Like struck her that day in bed to wake her up; Like struck her in the parlor; Like struck her in the van on the way to school; and Galario struck her. (Id.)  JKG may have also claimed Like punched her while Like drove her to the bus stop.  (Opp'n Ex. 3 at 2.)  However, according to a report by Gerald Higa,[1] who was engaged by Plaintiffs to review Adewundmi's investigation (see Opp'n Ex. 3), Like claimed she was ill that day and Galario drove JKG and other children to the bus stop.

After the interview with Adewundmi, JKG was taken to the emergency room at Hilo Medical Center to assess her injuries.  The emergency room doctor confirmed a contusion across JKG's face and a bruise across her nose. (Mot. Ex. B at 1.)  The doctor also interpreted her nasal bones as presenting a

---

[1]The Court notes that Higa's report specifically references Adewundmi's "case log of contact," which he explains provides a synopsis of Adewundmi's actions and conversations during the course of the investigation.  (Opp'n Ex. 3 at 2.)  The Court was not provided with a copy of this case log of contact from either party and, as a result, is unable to assess the accuracy of Higa's summary.  It should be noted, however, that Defendants failed to respond or object to Higa's descriptions in their Reply brief.

nondisplaced fracture; however, an over-reading by another physician indicated "[n]o fracture, displacement, or depression of the nasal bones."  (Id. at 4.)

According to Higa, Adewundmi also interviewed Like, Galario, and "Tiana, Tiffany and Dillan" that day at 3:30 p.m.  In that interview, Like denied hitting JKG and said the injury to her nose occurred on Sunday when the gate of the dog kennel was knocked into JKG while she was trying to feed a dog.  In an interview with Galario, Adewundmi wrote that Galario did not notice any injury on the child over the weekend.  Interviews with Tiana, Tiffany, and Dillan[2] confirmed that they did not see an injury on JKG during the weekend.  Indeed, Like claims in her declaration that another child, Ashley Prudencio, reported to Adewundmi that JKG had been hurt by the dogs jumping at the kennel gate.  (Like Decl. ¶ 2.)

Later that day, November 23, 2004, JKG was taken into police protective custody, released to DHS, and placed in a DHS non-relative foster home.  (Opp'n Ex. 4 at 1.)  On November 24, 2004, Galario signed a Voluntary Foster Custody Agreement, allowing JKG to remain in the DHS foster home.  (Ex. E, attached to Def.'s Concise Statement of Facts.)  Galario claims, in her

---

[2]It is unclear from the record who these children are or what their relationship to the family and/or household was.

declaration, that she only signed the agreement because Adewundmi threatened to take away her other children if she refused.  (Opp'n Galario Decl. ¶ 2.)

JKG remained at the DHS foster home throughout December 2004.[3] On January 10, 2005, Galario revoked the voluntary agreement.  (Ex. G, attached to Def.'s Concise Statement of Facts.)  As a result, JKG was again taken into police protective custody, as the child was reportedly fearful of returning home, and she remained in the DHS foster home.

On January 13, 2005, DHS filed a petition with the Family Court of the Third Circuit seeking temporary foster custody of JKG and family supervision of the other minor children residing in the home.  In support of the petition, Adewundmi filed an Initial Safe Family Home Report, which outlined the results of his investigation of the alleged abuse.  (Mot. Ex. E.)  Among the various concerns raised by the Initial Safe Family Home Report, Adewundmi argued that Dr. Lane Matsumura, JKG's last therapist of record, had not seen JKG since prior

_____

[3]On November 29, 2004, Galario petitioned for and was granted a Temporary Restraining Order against Like on behalf of JKG and Galario's foster daughter.  (Mot. Ex. H.)  In the petition, Galario states that she and Like are cousins and had been living together for 15 years.  She also explains that she is seeking the restraining order until the allegations of abuse of JKG are proven untrue and is looking out for the best interests of the children.  At the hearing on the instant motion, counsel for Plaintiffs asserted that Galario was forced to file the restraining order so that CPS did not take any of her other children away.  This Court was unable to find any evidence of such coercion.

5

to June 2003.  Because JKG presented significant mental health issues, Adewundmi was concerned that Galario had taken JKG out of treatment. Adewundmi also reported that JKG's school principal had noticed JKG's previously-vibrant personality had waned and JKG had shown signs of social withdrawal.

Adewundmi's Initial Safe Family Home Report also contained a summary of a visit he conducted at the Galario household on December 1, 2004. During that visit, Adewundmi claims Galario was uncooperative and became irate and verbally abusive.  Galario admits to using one profanity with Adewundmi. (Opp'n Galario Decl. ¶ 10.)

On January 18, 2005, Judge Yoshioka held a hearing in Family Court to determine if Galario could provide JKG with a safe home environment.  Galario and Like were present and represented by counsel.  (Mot. Ex. G.)  Judge Yoshioka issued an order requiring all prior orders to remain in full force, thus continuing JKG's placement at the DHS foster home.  Following this hearing, the matter was before the Family Court on several occasions.  (See representative orders in Mot. Ex. K.)  Each time, Galario and Like were present with counsel and each time the court ordered that DHS retain custody of JKG.

Adewundmi was relieved of his duties in the case at the end of April 2005 and C. Dale Gormley took over case management services for JKG.  (See Opp'n Ex. 9.)  It therefore appears that Adewundmi had no further involvement in the case after that point.

JKG has resided with her foster mother, Kelly Maldonado, since her removal from the Galario home in 2004.  At a Family Court hearing on January 22, 2009, Galario agreed to grant legal guardianship over JKG to Kelly Maldonado.  (See Opp'n Ex. 5.)  Galario, however, retained her parental rights to JKG.  (Opp'n Galario Decl. ¶ 11; Mot. at 8.)

In the interim, one of JKG's siblings, ELK, was living in the Galario/Like home.  When CPS placed ELK in a different foster home, Galario and Like were permitted regular visits and were seeking adoption of ELK.  In early 2007, ELK was placed in a new foster home with Lori and Marcos Amavisca.  On January 23, 2008, DHS filed a petition with the Family Court in favor of ELK's adoption by the Amaviscas.  Galario and Like intervened in the adoption petition, although Like subsequently withdrew her request.  Galario and Like now claim

that the only reason ELK was not permitted to reside in the Galario home was because of the JKG case.[4]

On November 22, 2006, Galario, individually and as a "Next Friend" to JKG, and Like filed the instant action in state court.  On March 22, 2007, the Defendants removed the case to this Court.  The complaint alleges causes of action against Adewundmi, Peggy Hilton, and Lillian Koller in both their individual and official capacities for violation of Plaintiffs' constitutional rights, under 42 U.S.C. § 1983, and deprivation of rights under the Hawaii state constitution.  The complaint also includes causes of action under state law for intentional and negligent infliction of emotional distress.  These state law claims are alleged against the State of Hawaii DHS and CPS as well as Adewundmi, Hilton, and Koller in both their individual and official capacities.  At all relevant times, Hilton was a supervising employee of CPS who attended several hearings relating to JKG, and Koller was the Director of CPS.

---

[4]Galario had already adopted JKG and KG, another sibling, by the time of her intervention in the ELK adoption.  DHS granted approval for Galario's adoption of KG on October 25, 2005 after two stipulations were entered:

1.    That the physical abuse of JKG had not been proven; and
2.    That Like and Galario had failed to appreciate the depth of JKG's psychological and emotional needs.

Defendants filed the instant motion on February 17, 2009.  (Doc.

#45.)  This Court granted Defendants' ex parte motion to file their concise

statement of facts, exhibits, and declarations under seal two days later.  (Doc. #

49.)   On April 9, 2009, Plaintiffs filed their opposition and concise statement of

facts.  (Doc. ## 54, 55.)  Defendants filed a brief reply on April 20, 2009.  (Doc. #

56.)  Finally, this Court granted Plaintiffs' ex parte motion to file their concise

statement of facts under seal.  (Doc. # 58.)

## STANDARD OF REVIEW

Rule 56 requires summary judgment to be granted when "the

pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Porter v. Cal. Dep't

of Corrections, 419 F.3d 885, 891 (9th Cir. 2005); Addisu v. Fred Meyer, Inc., 198

F.3d 1130, 1134 (9th Cir. 2000).  A main purpose of summary judgment is to

dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett,

477 U.S. 317, 323-24 (1986).

Summary judgment must be granted against a party that fails to

demonstrate facts to establish what will be an essential element at trial.  See id. at

323.  A moving party without the ultimate burden of persuasion at trial -- usually,

but not always, the defendant -- has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment.  Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls upon the moving party to identify for the court those "portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323).

Once the moving party has carried its burden under Rule 56, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial" and may not rely on the mere allegations in the pleadings.  Porter, 419 F.3d  at 891 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).  In setting forth "specific facts," the nonmoving party may not meet its burden on a summary judgment motion by making general references to evidence without page or line numbers.  S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Local Rule 56.1(f) ("When resolving motions for summary judgment, the court shall have no independent duty to search and consider any part of the court record not otherwise referenced in the separate concise statements of the parties.").  "[A]t least some 'significant probative evidence'" must be produced.  T.W. Elec. Serv., 809 F.2d at 630  (quoting First Nat'l Bank of Ariz. v.

10

Cities Serv. Co., 391 U.S. 253, 290 (1968)).  "A scintilla of evidence or evidence

that is merely colorable or not significantly probative does not present a genuine

issue of material fact."  Addisu, 198 F.3d at 1134.

When "direct evidence" produced by the moving party conflicts with

"direct evidence" produced by the party opposing summary judgment, "the judge

must assume the truth of the evidence set forth by the nonmoving party with

respect to that fact."  T.W. Elec. Serv., 809 F.2d at 631.  In other words, evidence

and inferences must be construed in the light most favorable to the nonmoving

party.  Porter, 419 F.3d at 891.  The court does not make credibility determinations

or weigh conflicting evidence at the summary judgment stage.  Id.  However,

inferences may be drawn from underlying facts not in dispute, as well as from

disputed facts that the judge is required to resolve in favor of the nonmoving party.

T.W. Elec. Serv., 809 F.2d at 631.

## DISCUSSION

Defendants move for summary judgment on various grounds,

including immunity, failure to meet the elements of a claim, collateral estoppel,

and the Rooker-Feldman doctrine.  (Mot. at 15.)  The Court will address the

Defendants' arguments as they relate to the various causes of action.

I.      Plaintiffs' State Law Claims

Plaintiffs brought state law claims for intentional infliction of emotional distress and negligent infliction of emotional distress, as well as a claim for violations of civil rights guaranteed under the Hawaii state constitution. Defendants claim they are entitled to immunity from suits under state law in federal court and that Plaintiffs fail to state a proper claim under state law.  (Mot. at 17.)

A.      Eleventh Amendment Sovereign Immunity

The Eleventh Amendment generally renders states immune from private damages claims brought in federal court.  Stanley v. Trustees of Cal. State Univ., 433 F.3d 1129, 1133 (9th Cir. 2006).  This "sovereign immunity" bars private citizens from suing the state in federal court under either federal- or state-law claims.  Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 106 (1984).

Thus, "[a]bsent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.'"  Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, 506 U.S. 139, 144 (1993) (citations omitted).  The Supreme Court and the Ninth Circuit have long held that where a State has not waived its immunity, "agencies of the state are immune from private damage

12

actions or suits for injunctive relief brought in federal court." In re Pegasus Gold Corp., 394 F.3d 1189, 1195 (9th Cir. 2005) (quoting Dittman v. California, 191 F.3d 1020, 1025 (9th Cir. 1999)); Franceschi v. Schwartz, 57 F.3d 828, 831 (9th Cir. 1995) ("[t]he Eleventh Amendment bars suits which seek either damages or injunctive relief against a state, an "arm of the state," its instrumentalities, or its agencies"); Pennhurst, 465 U.S. 89, 100 (1984) (the Eleventh Amendment "jurisdictional bar applies regardless of the nature of the relief sought"); Puerto Rico Aqueduct, 506 U.S. at 144.

Likewise, state officials acting in their official capacities are immune from suit for monetary damages under the Eleventh Amendment since the suit is no different from a suit against the State itself.[5]   Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989) ("a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.");

_____

[5]There is an exception to the immunity bar for state officials acting in their official capacities.  Sovereign immunity does not bar a suit "for prospective declaratory and injunctive relief . . . to enjoin an alleged ongoing violation of federal law." Wilbur v. Locke, 423 F.3d 1101, 1111 (9th Cir. 2005) (quoting Agua Caliente Band of Cahuilla Indians v. Hardin, 223 F.3d 1041, 1045 (9th Cir. 2000); see Ex parte Young, 209 U.S. 123 (1908); see also Will, 491 U.S. at 71 n.10 ("official-capacity actions for prospective relief are not treated as actions against the State.").  In this case, there is no request for declaratory or injunctive relief, but merely a demand for retrospective damages, and therefore this exception does not apply.

13

see also Hafer v. Melo, 502 U.S. 21, 24-25 (1991) (holding that a defendant acting in his official capacity receives the same immunity as the government agency to which he belongs).  As a result, it appears at first blush that Defendants State of Hawaii DHS, CPS, and the individual defendants in their official capacity are immune from suit for Plaintiffs' state law claims in federal court.

However, sovereign immunity to suit in federal court can be waived in two ways: voluntary consent or affirmative litigation in federal court.  A state waives Eleventh Amendment immunity if it voluntarily consents to be sued in federal court.  See Stanley, 433 F.3d. at 1133.  The test for voluntary consent is a stringent one that requires an unequivocal expression of intent, such as a statute or constitutional amendment that clearly sets forth the state's intention to subject itself to suit in federal court.  Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 241 (1985) (superseded by statute on other grounds). Here, there is no such statute, constitutional provision, or any other unequivocal expression of intent.[6]

_____

[6]The state did consent to being sued for negligent and intentional infliction of emotional distress committed by its employees in state court under the Hawaii State Tort Liability Act.  See Haw. Rev. Stat. §§ 662-2 & 662-15(1).  Plaintiffs' original complaint filed in state court was, therefore, proper.  However waiver of sovereign immunity under the State Tort Liability Act only applies to suits in state court, not federal court.  See Sherez v. State of Hawaii Dep't of Educ., 396 F. Supp.2d 1138, 1144-45 (D. Haw. 2005); Office of Hawaiian Affairs v. Dep't of Educ., 951 F. Supp. 1484, 1491 (D. Haw. 1996).  Courts have found the language
(continued...)

A state can also waive its Eleventh Amendment immunity if it engages in certain affirmative "conduct that is incompatible with an intent to preserve that immunity." Hill v. Blind Indus. & Services, 179 F.3d 754, 758 (9th Cir. 1999). Under certain circumstances, a court may find that removal from state court to federal court is conduct that constitutes waiver. Lapides v. Bd. of Regents of Univ. Sys. of Ga., 535 U.S. 613, 619 (2002); Embury v. King, 361 F.3d 562, 566 (9th Cir. 2004).

In Lapides, the plaintiff, a former employee of the Georgia State University, sued the University's Board of Regents in state court asserting both state- and federal-law claims. Lapides, 535 U.S. at 616. The Board of Regents removed the case to federal court, and then moved to dismiss on grounds of Eleventh Amendment immunity. Id. The Court held that the state waived its Eleventh Amendment immunity on the state-law claims when it voluntarily removed the case to federal court. Id. at 622. In Embury, the Ninth Circuit Court of Appeals extended the ruling in Lapides when it held that, upon removal, the

---

[6](...continued)
of the State Tort Liability Act as not evincing "unequivocal indication" of the state's consent to suit in federal court and thus not a consensual waiver of sovereign immunity under the Eleventh Amendment. Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc., 810 F.2d 869, 873-74 (9th Cir. 1987).

state also waives Eleventh Amendment immunity for federal-law claims.   361 F.3d at 566.

In this case, Defendants waived sovereign immunity to suit in federal court when they voluntarily availed themselves of the federal court system by removing the case from state court.  As a result, the state, its agencies, and the individual defendants in their official capacity cannot now claim immunity from suit for state torts in federal court.  Plaintiffs' state law claims are therefore properly before this Court.

B.     Absolute Immunity Under Hawaii Revised Statutes § 350-3

Defendants also claim that Adewundmi and Hilton are absolutely immune from suits arising out of the performance of their duties at CPS.  Hawaii Revised Statute § 350-3 provides that "[a]ny individual who assumes a duty or responsibility pursuant to section 350-2 or chapter 587 shall have immunity from civil liability for acts or omissions performed within the scope of the individual's duty or responsibility."  Haw. Rev. Stat. § 350-3(b).  Chapter 587 establishes a comprehensive plan for the protection of children who have been abused or neglected, by investigating complaints of abuse, removing children from their parents' custody, placing children in foster care, and initiating further action in the Family Court, when warranted.  See Haw. Rev. Stat. § 587-21.  The issue thus, is

whether Adewundmi and Hilton were acting within the scope of their duties when they allegedly committed the state law torts at issue.

Although there is very little Hawaii law explaining the scope of employment as understood in § 350-3, employment cases involving respondeat superior liability for an employer where an employee acting within the scope of employment commits a tort are helpful to this analysis.[7]  To determine whether a tort was committed within the scope of an employee's employment under Hawaii law, Hawaii courts follow the Restatement of Agency § 228, which provides that:

> (1) Conduct of a servant is within the scope of employment if, but only if:
> (a) it is of the kind he is employed to perform;
> (b) it occurs substantially within the authorized time and space limits; [and]
> (c) it is actuated, at least in part, by a purpose to serve the master[.] . . .
> (2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

---

[7]This Court is cognizant of the fact that the scope of employment cases and Restatement of Agency approach this issue from the standpoint of liability of the employer, rather than through a lens of qualified immunity for the individual employee's acts.  However, this Court finds such cases to be instructive, because the Hawaii Revised Statute at issue clearly states that the scope of employment is the pertinent question, and does not follow the line of cases regarding qualified immunity under 42 U.S.C. § 1983.

<u>Wong-Leong v. Hawaiian Indep. Refinery, Inc.</u>, 879 P.2d 538, 543 (Haw. 1994).

"In determining the scope of employment, the applicable test is whether the employee's conduct was related to the employment enterprise or if the enterprise derived any benefit from the activity." <u>Id.</u> at 546.

The Restatement of Agency section 229 provides that "[t]o be within the scope of the employment, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized." Restatement of Agency 2d § 229 (1958). The comments provide that

> a servant is authorized to do anything which is reasonably regarded as incidental to the work specifically directed or which is usually done in connection with such work . . . [a]lthough an act is a means of accomplishing an authorized result, it may be done in so outrageous or whimsical a manner that it is not within the scope of employment.

Restatement § 229 comments a and b. Following the Restatement, the Hawaii Supreme Court has noted that an act, "although forbidden, or done in a forbidden manner, may be within the scope of employment . . . the ultimate question is whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business [.]" <u>State v. Hoshijo ex rel. White</u>, 76 P.3d 550, 563 n.29 (Haw. 2003) (finding that the actions of a student manager of the state university basketball team in shouting racial slurs

at a spectator at a basketball game was conduct within scope of employment

because he was required to attend games, work on the bench, assist the team, it was

foreseeable that he would interact with the public at games, and the handbook

proscribed use of obscene or inappropriate language to spectators).

In this case, Plaintiffs complain that Adewundmi failed to perform "a

minimally adequate investigation" and failed to comply with CPS rules by ignoring

evidence and acting with a hostile attitude towards Plaintiffs because of their

presumed homosexual relationship.  (Compl. ¶¶ 16-17.)  Plaintiffs also allege that

Hilton and Koller were aware of Adewundmi's mistaken belief as to their sexuality

and did nothing to prevent Adewundmi from acting on it to their detriment.

(Compl. ¶ 17.)  Finally, Plaintiffs claim that Hilton and Koller failed to adequately

supervise, train, and discipline Adewundmi and failed to correct his inadequate

investigation, resulting in inadequate therapeutic services and case management.[8]

(Compl. ¶ 18-20.)

---

[8]It also appears Plaintiffs allege that Defendants are liable for Like being
"displaced from her home and forced to terminate care for foster children under her
care."  (Compl. ¶ 22.)  A review of the record indicates, however, that it was
Plaintiff Galario who filed a temporary restraining order against Like as a result of
the abuse allegations.  (See Mot. Ex. H.)  As such, this Court finds that such an
allegation is meritless.

Hawaii Revised Statute section 587-21 provides:

(a) Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, the department shall cause such investigation to be made as it deems to be appropriate. In conducting the investigation the department may:

 (1) Enlist the cooperation of appropriate law enforcement authorities for phases of the investigation for which they are better equipped . . . ; and

 (2) Interview a child who is the subject of an investigation without the prior approval of and without the presence of the child's family, including temporarily assuming protective custody of the child for the purpose of conducting the interview, if the action is deemed necessary and appropriate under the circumstances by the department and a police officer.

(b) Upon satisfying itself as to the course of action that should be pursued to best accord with the purpose of this chapter, the department shall: . . .

 (3) Assume temporary foster custody of the child pursuant to section 587- 24(a) and file a petition with the court under this chapter within three working days . . . after the date of the department's assumption of temporary foster custody of the child . . .

It is undisputed that Adewundmi was assigned these duties with respect to JKG.  Thus, clearly, acts or omissions allegedly committed by Adewundmi while investigating the report of possible abuse by speaking with JKG, family members, school officials, and friends constitute acts within the scope

of his duties.  Certainly, as the assigned case worker, Adewundmi was employed to perform such acts, each of those alleged acts occurred within his work time and space, and were performed to serve his employer, CPS.  Indeed, considering the seriousness of the abuse alleged, Adewundmi may have breached his duties by not interviewing people and conducting an investigation.  See Williamson v. Basco , No. 06-00012, 2007 WL 4570496, at *6-7 (D. Haw. Dec. 31, 2007) (finding that Defendant Asato was entitled to immunity pursuant to HRS § 350-3 with respect to the plaintiff's IIED claim because all of the plaintiff's claims against Asato, including the claim that Asato failed to talk to the children's teachers, arose out of the performance of his duties of investigating child abuse as a CPS employee); see also Kaho'ohanohano v. Dep't of Human Servs., 178 P.3d 538, 564-65 (Haw. 2008) (holding social workers have a statutory duty to protect children from further abuse when specifically identified as suspected victims of abuse and that DHS breached its statutory duty by failing to conduct a proper and timely investigation).

Plaintiffs have produced no evidence that Adewundmi, Hilton, or Koller's conduct was intentionally tortious or so outrageous as to no longer be considered conduct serving the purposes of the employer.  Plaintiffs have produced no evidence to show that any of the above conduct was outside of the normal risks to be borne by DHS or CPS, or were outside of the same general nature as that

authorized, or incidental to the conduct authorized.  In fact, the delicate circumstances and vulnerable children involved in CPS investigations require social workers to act in the best interests of children with little information and, often times, conflicting information.  This Court finds that the Plaintiffs have failed to allege any actions that fall outside of the realm of judgment and discretion left to case workers.  Accordingly, the Court holds that Adewundmi, Hilton, and Koller are absolutely immune from Plaintiffs' state law claims in their individual capacities.  The State of Hawaii, DHS, CPS, and the individual defendants in their official capacities (as essentially the same entity) are not, however, subject to absolute immunity under § 350-3.

> C.   IIED and NIED

Defendants claim that Plaintiffs have failed to provide sufficient evidence to prove a cause of action for intentional infliction of emotional distress ("IIED") and negligent infliction of emotional distress ("NIED").  In particular, Defendants assert that Plaintiffs have not shown sufficiently "outrageous" conduct nor have they shown actual emotional harm necessary for a claim of IIED. (Mot. at 23.)  Similarly, Defendants argue Plaintiffs' NIED claim fails because Plaintiffs have not demonstrated an actual, physical harm.  (Mot. at 23-24.)

In order to establish an IIED claim, a plaintiff must show "'(1) that the act allegedly causing the harm was intentional or reckless, (2) that the act was outrageous, and (3) that the act caused (4) extreme emotional distress to another.'" Enoka v. AIG Haw. Ins. Co., 128 P.3d 850, 872 (Haw. 2006) (quoting Hac v. Univ. of Haw., 73 P.3d 46, 60-61 (Haw. 2003)).  The Hawaii Supreme Court defines the term "outrageous" as conduct "without just cause or excuse and beyond all bounds of decency." Enoka, 128 P.3d at 872.  An IIED claim cannot be sustained by "threats, annoyances, petty oppressions, or other trivialities." See Bragalone v. Kona Coast Resort Joint Venture, 866 F. Supp. 1285, 1294 (D. Haw. 1994).  "[P]laintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."  Restatement (Second) of Torts § 46 cmt. d.

In this case, the Court agrees that no such "outrageous" conduct was committed by any Defendant.  While Adewundmi's investigation may have been subpar or even negligent, Plaintiffs have not demonstrated that his actions were "beyond all bounds of decency." Enoka, 128 P.3d at 872.  Moreover, his supervisors and employer, CPS, have committed no outrageous acts of their own. Accordingly, this Court GRANTS Defendants summary judgment on the IIED claim and it is hereby dismissed.

Plaintiffs' NIED claim must be dismissed as well.  Plaintiffs may recover NIED "where a reasonable [person], normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case."  Doe Parents No. 1 v. State, Dep't of Educ., 58 P.3d 545, 580 (Haw. 2002) (citation and internal quotation marks omitted).  An NIED claim that fails to allege physical injury as damage "is nothing more than a negligence claim in which the alleged actual injury is wholly psychic and is analyzed utilizing ordinary negligence principles."  Id. (citation and internal quotation marks omitted).  To maintain a NIED claim, the Hawaii Supreme Court, thus, has held that a person must allege "that someone was physically injured by the defendant's conduct, be it the plaintiff himself or herself or someone else," otherwise the person may maintain a negligence claim only.  Id. at 580-81 (emphasis in original).

The Supreme Court of Hawaii, however, has carved out specific categorical exceptions to this general rule.  For example, the court has allowed recovery for an NIED claim without a showing of an injury for HIV exposure, for mishandling of a corpse, and for parents seeking recovery for a teacher's molestation of their child at school.  Doe Parents, 58 P.3d at 90; see also Soone v. Kyo-Ya Co., 353 F. Supp. 2d 1107, 1118 (D. Haw. 2005).  These exceptions were created based upon the reasonableness standard articulated in Rodrigues v. State,

24

52 Haw. 283 (Haw. 1970) -- i.e., where a reasonable man, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case.  Soone, 353 F. Supp. 2d at 1118.

The Hawaii Supreme Court also recently held that a trial court had not erred when it found DHS liable to parents of an abused child under a claim for NIED.  See Kaho'ohanohano, 178 P.3d at 584.  In that case, a father and grandfather brought an action against DHS for, among other things, NIED, alleging that DHS was negligent in its failure to properly investigate and protect the child from abuse when it had previously received reports of suspected child abuse.  Id. at 542.  The child was subsequently severely beaten and the father claimed he suffered emotional distress resulting from witnessing her physical suffering.  Id. at 584.  The Hawaii Supreme Court affirmed the trial court's holding that an NIED claim could proceed.  Id.

Here, Plaintiffs have not alleged any physical injury either to themselves or JKG; rather, they assert only psychic or emotional harm resulting from Defendants' alleged misconduct.  The Court finds that such allegations are not sufficient to state a cause of action for NIED.  Although the Hawaii Supreme Court has carved out exceptions to the physical injury requirement, all of the cases mentioned above involved some kind of physical touching, harm, injury, or future

25

threat thereof.  Exposure to HIV entails a threat, physical in nature, to one's health and well-being.  Mishandling of a corpse involves the desecration of a loved one's physical remains.  Molestation certainly entails inappropriate and harmful touching of a child.  In addition, the severe emotional distress claimed by those plaintiffs arose directly out of such physical harm or threat of physical harm.  As such, even the exceptions to the physical injury requirement entail some kind of harm beyond mere psychic distress.

The Kaho'ohanohano case is likewise distinguishable.  The Hawaii Supreme Court made clear in Kaho'ohanohano that the father's distress arose directly out of his witnessing the child's physical and emotional suffering, not merely from a faulty investigation on the part of DHS.  Id.  In this case, in contrast, no such suffering occurred.  JKG was removed from the Galario home based on reported physical abuse by Plaintiffs and placed in foster care to protect her physical safety.  Plaintiffs' distress, therefore, arises not out of any alleged physical injury or threat of physical injury but instead out of the allegedly negligent investigation by Adewundmi and CPS.  Although understandably upsetting, the investigation and removal of JKG are not similar in gravity or facts to the situations outlined above.

This is to be distinguished from a case in which a CPS worker conducted a biased and inadequate investigation, removed the child from the parents' custody based on that inadequate investigation, placed him or her in foster care, and then the child was subsequently physically abused by the foster parent. In such a case, not present here, the Court believes the Hawaii Supreme Court's decision in <u>Kaho'ohanohano</u> would support an NIED claim.  In that case, the child's injury would be the result of the flawed CPS investigation and a parent's distress at knowing their child was harmed would be similar to the harm found in <u>Kaho'ohanohano</u>.  No such situation exists here.  The only harm alleged is the psychic distress resulting from a poor investigation.  That is a harm classically reserved for negligence claims, not NIED, and this Court is reticent to create or extend a state law cause of action where none exists presently.  Permitting such NIED claims would swing the courthouse doors open to any parent having interaction with CPS and would further undermine the effectiveness of social workers in doing what they are supposed to do: protect the best interests of the child.

Accordingly, this Court GRANTS summary judgment to Defendants for the NIED claim and it is hereby dismissed.

D.    Hawaii State Constitutional Claims

Plaintiffs also allege that Defendants violated the rights guaranteed to them under Article I, Sections 2, 4, 5, and 8 of the Constitution of the State of Hawaii. Defendants move for summary judgment, arguing Plaintiffs fail to state a claim under the Hawaii Constitution.  (Mot. at 27.)

In the first instance, State constitutional claims are not covered by § 1983.[9]  Moreland v. Las Vegas Metro. Police Dep't, 159 F.3d 365, 371 (9th Cir. 1998) ("state law violations do not, on their own, give rise to liability under § 1983" (citation omitted)); Lovell v. Poway Unified Sch. Dist., 90 F.3d 367, 370 (9th Cir. 1996) ("Section 1983 limits a federal court's analysis to the deprivation of rights secured by the federal 'Constitution and laws.'").  Therefore, it appears Plaintiffs are bringing their claim directly under the state constitution.

The courts of Hawaii have thus far declined to recognize a direct private cause of action for violation of rights guaranteed under the state constitution.  See Makanui v. Dep't of Educ., 721 P.2d 165, 170 n.2 (Haw. Ct. App. 1986) ("We do not decide whether Hawaii recognizes a cause of action for damages for deprivation of rights under the state's constitution or laws.); see also Maizner v. Hawaii Dep't of Educ., 405 F. Supp. 2d 1225, 1240 (D. Haw. 2005).

_____

[9]Plaintiffs' § 1983 claim will be addressed in Section II, infra.

Plaintiffs point this Court to no other legal authority that such an action is cognizable and this Court will not infer or create such a cause of action.  As such, the Court GRANTS Defendants' motion for summary judgment as to Plaintiffs' direct claim for violation of their Hawaii constitutional rights and dismisses the claim.

II.    Plaintiffs' § 1983 Claim

Plaintiffs allege that Adewundmi, Hilton, and Koller[10] violated their rights under the First, Fifth, Ninth, and Fourteenth Amendments of the United States Constitution by removing JKG from their home, disrupting family bonds, failing to provide for their therapeutic needs, interfering with pending adoptions, and failing to provide for timely and effective family reunification.  (Compl. ¶ 40.) Plaintiffs assert that the individual defendants committed these acts with animus toward Plaintiffs and in retaliation for their presumed homosexual lifestyle.  (Id.) In their opposition brief, Plaintiffs clarify that their § 1983 claim is based on a violation of their equal protection rights under the Fourteenth Amendment.  (Opp'n at 6.)

---

[10]Plaintiffs did not sue the State, DHS, or CPS under their § 1983 claim.  It appears, however, that Plaintiffs did sue the individual defendants in both their official and individual capacities.  (Compl. ¶¶ 4-6.)

Defendants, in their motion for summary judgment, assert three

separate forms of immunity: sovereign immunity, absolute prosecutorial immunity,

and qualified immunity.  The Court will address each claim in turn.

    A.    <u>Sovereign Immunity for Individual Defendants in their Official
Capacities</u>

The state, its agencies, and its employees acting in their official

capacity cannot be sued, as a matter of law, for violations of civil rights under §

1983.  <u>See</u> <u>Will</u>, 491 U.S. at 70.  In <u>Will</u>, the Supreme Court explained that "States

or governmental entities that are considered 'arms of the State' for Eleventh

Amendment purposes" are not "persons" under § 1983.  <u>Id.</u>  Moreover, because "a

suit against a state official in his or her official capacity . . . is no different from a

suit against the State itself," <u>id.</u> at 71, state officials sued in their official capacities

are not "persons" under § 1983 and are generally therefore entitled to Eleventh

Amendment immunity.  <u>See also</u> <u>Flint v. Dennison</u>, 488 F.3d 816, 824-25 (9th Cir.

2007).  Accordingly, Adewundmi, Hilton, and Koller, as officials employed by

CPS, are therefore immune from suit under § 1983.

This is to be distinguished from the discussion of the State's waiver of

immunity outlined in Section I(A), <u>supra</u>.  In that instance, the State of Hawaii had

expressly waived its immunity from suit for torts of its employees in state courts

under the State Tort Liability Act.  It had then waived its immunity from such suits in a federal court forum by voluntarily removing the action from state court to this Court.  In contrast, the State has never waived its immunity from suit under § 1983 in any jurisdiction and removing the entire action does not de facto waive this immunity.  A State cannot be a "person" under the language of § 1983 and therefore the State and its employees are immune from suit under § 1983 in any forum, except in the case of a request for prospective declaratory or injunctive relief.

As such, the Court finds that Adewundmi, Hilton, and Koller are immune from suit under § 1983 for actions done in their official capacities.  The Court, therefore, dismisses Plaintiffs' § 1983 claims against Adewundmi, Hilton, and Koller in their official capacities.  They are not immune under this principle, however, in their individual capacities.

B.    <u>Absolute Prosecutorial Immunity</u>

Defendants also argue they are absolutely immune from suit under § 1983 for "performing quasi-prosecutorial functions connected with the initiation and pursuit of child dependency proceedings."  <u>Meyers v. Contra Costa County Dep't of Social Servs.</u>, 812 F.2d 1154, 1157 (9th Cir. 1987).

The United States Supreme Court has recognized absolute immunity from suit alleging violations of § 1983 for a variety of persons who perform functions that are integral to the judicial process.  See Briscoe v. LaHue, 460 U.S. 325, 342 (1983).  Absolute judicial immunity protects such persons "from any damage action in the performance of their duties.  Under this theory, absolute immunity precludes the imposition of any liability on the alleged wrongdoers, regardless of how wrongful that person's conduct may have been."  Seibel v. Kemble, 631 P.2d 173, 177 (Haw. 1981).  However, "the presumption is that qualified rather than absolute immunity is sufficient . . . and [the Supreme Court] [has] been quite sparing in [their] recognition of absolute immunity."  Burns v. Reed, 500 U.S. 478, 486-478 (1991).  The parties asserting entitlement to absolute immunity, in this case, the individual defendants, bear the burden of establishing the justification for such immunity.  Antoine v. Byers & Anderson, Inc., 408 U.S. 429, 433 (1993).

Whether a person is entitled to absolute immunity is not analyzed merely by their position title, but instead rests on the type of function that they are performing.  Briscoe, 460 U.S. at 342 n.28 (citing Imbler v. Pachtman, 424 U.S. 409, 430-431 (1976) (reserving the question whether a prosecutor, who is absolutely immune for decisions to initiate a prosecution or put witnesses on the

32

stand, has similar immunity for administrative or investigative tasks) and <u>Hampton</u>

<u>v. City of Chicago</u>, 484 F.2d 602, 608 (7th Cir. 1973) (prosecutor's immunity

ceases when he acts in a capacity other than his quasi-judicial role)); <u>see</u> <u>also</u> <u>Doe</u>

<u>v. Lebbos</u>, 348 F.3d 820, 825 (9th Cir. 2003) (looking at the "nature of the function

performed, not the identity of the actor who performed it.") (citation omitted)

<u>overruled on other grounds by</u> <u>Beltran v. Santa Clara</u>, 514 F.3d 906, 908 (9th Cir.

2008).

   With respect to social workers, the Ninth Circuit has held that "social

workers are entitled to absolute immunity in performing quasi-prosecutorial

functions connected with the initiation and pursuit of child dependency

proceedings." <u>Meyers</u>, 812 F.2d at 1157.  This is because, like a prosecutor,

> [t]he social worker must make a quick decision based on
> perhaps incomplete information as to whether to
> commence investigations and initiate proceedings against
> parents who may have abused their children. The social
> worker's independence, like that of a prosecutor, would
> be compromised were the social worker constantly in fear
> that a mistake could result in a time-consuming and
> financially devastating civil suit.

<u>Id.</u>

   Social workers, therefore, generally have absolute immunity when

they make "discretionary, quasi-prosecutorial decisions to institute court

33

dependency proceedings to take custody away from parents." <u>Miller v. Gammie</u>,

335 F.3d 889, 898 (9th Cir. 2003) (en banc).  The Ninth Circuit has recently

clarified, however, that social workers do not enjoy such immunity from claims

that "they fabricated evidence during an investigation or made false statements in a

dependency petition affidavit that they signed under penalty of perjury." <u>Beltran</u>,

514 F.3d at 908.  Such actions are not a part of the prosecutorial function and

therefore do not warrant absolute immunity.  <u>Id.</u>

In this case, Plaintiffs allege that Adewundmi conducted a flawed and

inadequate investigation and made several reports which included false

information as to their supposed homosexual relationship.  In light of <u>Beltran</u>, it is

clear Adewundmi is not entitled to absolute immunity for those alleged actions.  To

the extent that Plaintiffs' allegations against Hilton and Koller involve their role as

supervising and ratifying Adewundmi's flawed investigation, such actions are

likewise not subject to absolute immunity.

C.   <u>Qualified Immunity</u>

"To establish that a state official is personally liable in an action under

42 U.S.C. § 1983, a plaintiff must show that 'the official, acting under color of

state law, caused the deprivation of a federal right.'" <u>Spoklie v. Montana</u>, 411 F.3d

1051, 1060 (9th Cir. 2005) (quoting <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991)).  As

34

long as the official's "conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known," he or she

has qualified immunity from civil liability under § 1983. Id. The Supreme Court

recently clarified, however, that it is within the court's discretion to decide "which

of the two prongs of the qualified immunity analysis should be addressed first in

light of the circumstances in the particular case at hand." Pearson v. Callahan, ---

U.S. --- , 129 S. Ct. 808, 818 (2009). The party asserting qualified immunity bears

the burden of proving that the defense applies. Benigni v. City of Hemet, 879 F.2d

473, 479 (9th Cir. 1988).

In this case, it is somewhat unclear what precise right is being

claimed. Plaintiffs emphasize in their opposition brief that their § 1983 claim is

premised only on principles of equal protection (see Opp'n at 6). This claim is not

based on Plaintiffs' membership in a suspect class, but rather relies on recent cases

outlining the so-called "class-of-one" violations. (Id.)

The Supreme Court formally recognized class-of-one equal protection

actions in Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam). In

Olech, a municipality conditioned water service for a property on the

plaintiff-owner's granting a 33-foot easement, even though it required only a

15-foot easement from every other property owner. Id. at 563. In a short, per

curiam opinion, the Court allowed the plaintiff to proceed on the class-of-one

theory, recognizing claims where a "plaintiff alleges that she has been intentionally

treated differently from others similarly situated and that there is no rational basis

for the difference in treatment." Id. at 564.  The Court stated that allegations of

irrational and wholly arbitrary treatment, even without allegations of improper

subjective motive, were sufficient to state a claim for relief under equal protection

analysis.  Id. at 565.

        Courts have been reluctant, however, to extend such class-of-one

cases to situations outside of the regulatory land-use context.  See Engquist v.

Oregon Dep't of Agric., 478 F.3d 985, 996 (9th Cir. 2007) (declining to expand

public employment jurisprudence under class-of-one theory).  "[U]nless

constrained, the class-of-one theory of equal protection claim could provide a

federal cause of action for review of almost every executive or administrative

government decision."  Id. at 993.  As such, the scope of class-of-one claims

outside of land-use regulation is unclear.

        The situation is complicated by the fact that Plaintiffs' claim, although

couched in an equal protection context, appears to implicate principles of due

process as well.  There is a well established liberty interest of parents in the

custody of their children.  See Campbell v. Burt, 949 F. Supp. 1461, 1466 (D.

36

Haw. 1996). "There are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate." Id. (citation and internal quotation marks omitted). Indeed, the Ninth Circuit held that:

> [p]arents and children have a well-elaborated constitutional right to live together without governmental interference. The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies. Officials violate this right if they remove a child from the home absent information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury. The Fourth Amendment also protects children from removal from their homes absent such a showing.

Rogers v. County of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (citations and internal quotation marks omitted).[11]

Based on the complicated nature of Plaintiffs' claims and in light of Supreme Court's holding in Pearson, this Court finds it more appropriate to

---

[11]The Court notes, however, that Like may not claim a violation of her due process rights to the sanctity of her family because she is not JKG's mother. Despite the fact that Like may have resided in the same house with JKG and may have had a close personal relationship with her, the fundamental right to the maintenance of one's family is generally only extended to those with a legal familial relationship. See Brittain v. Hansen, 451 F.3d 982, 994-95 (9th Cir. 2006).

address qualified immunity in this case by analyzing the "second" prong: whether a reasonable officer could have believed his actions were lawful.

"If a reasonable official could have believed that his actions were lawful, summary judgment on the basis of qualified immunity is appropriate. . . . Only if there be a genuine issue of fact that would preclude a grant of summary judgment, should the court let the case proceed to trial." Hemphill v. Kincheloe, 987 F.2d 589, 592-93 (9th Cir. 1993) (citations omitted). "[T]he court should ask whether the agents acted reasonably under settled law in the circumstances, not whether another reasonable, or more reasonable, interpretation of the events can be constructed [several] years after the fact." Hunter v. Bryant, 502 U.S. 224, 228 (1991). Indeed, the qualified immunity doctrine protects government officials from their exercise of poor judgment, and fails to protect only those who are "plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" Pearson, 129 S. Ct. at 815 (citation omitted).

In this case it is very difficult to discern what exactly went into Adewundmi's investigation and on what grounds he recommended removing JKG

38

from the Galario home.  There is significant factual dispute as to what was said to

Adewundmi about the cause of JKG's facial injuries, including an indication that

JKG herself may have made conflicting statements on the day of her removal.

Like contends another child informed Adewundmi that JKG had been hurt by

family dogs but there is no evidence from Adewundmi or any CPS report that such

statements were made.  Furthermore, there is conflicting evidence as to whether

Adewundmi knew or believed that Plaintiffs were engaged in a homosexual

relationship, or that any of his actions were premised on such animus.  As a result,

there are simply too many genuine issues of fact remaining as to whether

Adewundmi in fact conducted an adequate or reasonable investigation, whether he

was motivated by irrational animus towards presumed homosexuals, and whether

he violated Plaintiffs' constitutional rights based upon that alleged animus.  In such

circumstances, qualified immunity is inappropriate and summary judgment must be

denied.  The Court therefore denies qualified immunity to Adewundmi in his

individual capacity.

        Hilton and Koller, on the other hand, are granted qualified immunity

for their actions.  As to Hilton, this Court finds that Plaintiffs have failed to allege

sufficient facts to demonstrate that she was sufficiently involved in JKG's case.

"In order for a person acting under color of state law to be liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation." Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiffs support their claims against Hilton by noting that she "was personally present and participated in multiple hearings in JKG's case." (Opp'n at 9.) In the first instance, the Court notes Hilton was not present at one of the two hearings Plaintiffs' cite as proof of her participation. (See Opp'n Ex. 6 & 7.) Nevertheless, mere presence at the hearing, without more, is insufficient to demonstrate a showing of personal participation under § 1983. Plaintiffs have presented no evidence that Hilton was involved in any of the decision making or direct actions taken on behalf of JKG. Hilton, therefore, is entitled to qualified immunity.

Likewise, Koller is entitled to qualified immunity. Under § 1983, liability may not be imposed on supervisory personnel for the actions of their employees under a theory of respondeat superior. When a defendant holds a supervising position, the causal link between the defendant and the claimed constitutional violation must be specifically established. See Fayle v. Stapley, 607 F.2d 858, 862 (9th Cir. 1979); Mosher v. Saalfeld, 589 F.2d 438, 441 (9th Cir. 1978), cert. denied, 442 U.S. 941 (1979). Plaintiffs must demonstrate that Koller

either: personally participated in the alleged deprivation of constitutional rights;

knew of the violations and failed to act to prevent them; or promulgated or

"implemented a policy so deficient that the policy 'itself is a repudiation of

constitutional rights' and is 'the moving force of the constitutional violation.'"

Hansen v. Black, 885 F.2d 642, 646 (9th Cir. 1989) (internal citations omitted); see

Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

Here, although Plaintiffs' complaint alleges such personal knowledge

and inadequate policies, they have failed to produce any evidence thereof.  There is

simply no connection between Koller, in her individual capacity, and the instant

case.  Plaintiffs have produced no evidence that Koller was aware of the JKG case

or that she had any involvement in the investigation or decision to remove JKG

from the Galario house.  As such, this Court finds that Koller is entitled to

qualified immunity.

III.    Rooker-Feldman Doctrine and Collateral Estoppel

Defendants also claim that Plaintiffs' claims are barred by the doctrine

of collateral estoppel and the Rooker-Feldman abstention doctrine.  (Mot.

41

at 24-26.)  In essence, Defendants argue that Plaintiffs's civil action is seeking to overturn the Family Court's decision to keep JKG in foster care.

In response, Plaintiffs contend that they are not seeking a return of JKG to their family home nor are they requesting a reversal of the Family Court's temporary custody orders.  (Opp'n at 12-14.)  Instead, they are seeking damages for what they claim to be the inadequate and biased investigation practices used by Adewundmi which resulted in their loss of custody.

This Court agrees with Plaintiffs.  The evolution of preclusion concepts over the years has led to the use of varying and, at times, seemingly conflicting terminology.  Res judicata and collateral estoppel have been used by courts and commentators as umbrella terms that encompass all preclusive effects of former adjudication, as well as synonyms for claim preclusion.  To avoid any confusion, this Court will refer exclusively to issue preclusion and claim preclusion.  Issue preclusion "refers to the effect of a judgment in foreclosing relitigation of a matter that has been litigated and decided."  Migra v. Warren City Sch. Dist., 465 U.S. 75, 77 n. 1 (1984).  Claim preclusion "refers to the effect of a judgment in foreclosing litigation of a matter that never has been litigated, because of a determination that it should have been advanced in an earlier suit."  Id.

With issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." Montana v. United States, 440 U.S. 147, 153 (1979).  The relevant question in deciding whether a federal court is to give preclusive effect to a state court judgment is whether "the courts of the State from which the judgments emerged would do so." Allen v. McCurry, 449 U.S. 90, 96 (1980).  Accordingly, this Court must consider when a Hawaii state court would employ issue preclusion.

The Hawaii Supreme Court has held that issue preclusion bars relitigation of an issue where: " (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication." Dorrance v. Lee, 976 P.2d 904, 910 (Haw. 1999).

In this case, there is no question that issue preclusion does not bar the instant action.  The Court in the instant case will not be assessing whether JKG should have been removed from the Galario home or what arrangement would have been in her best interests.  That was the sole province of the Family Court.

The issue being litigated before this Court, on the other hand, involves the question of whether Adewundmi conducted his investigation in a reasonable and legal fashion.  Although the Family Court may have heard arguments as to the appropriateness of Adewundmi's investigation, the issues to be decided by the Family Court were entirely different from those presented in this case.  As such, this case does not implicate principles of collateral estoppel.

Neither does the <u>Rooker-Feldman</u> doctrine bar the instant action.  The <u>Rooker-Feldman</u> doctrine generally bars federal district courts "from exercising subject matter jurisdiction over a suit that is a de facto appeal from a state court judgment."  <u>Kougasian v. TMSL, Inc.</u>, 359 F.3d 1136, 1139 (9th Cir. 2004). The Supreme Court emphasized in <u>Exxon Mobil Corp. v. Saudi Basic Industries Corp.</u>, 544 U.S. 280, 284 (2005), that the <u>Rooker-Feldman</u> doctrine:

> is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. Rooker-Feldman does not otherwise override or supplant preclusion doctrine or augment the circumscribed doctrines that allow federal courts to stay or dismiss proceedings in deference to state-court actions.

<u>Id.</u>

As Plaintiffs have emphasized, the instant action is not brought to contest or review the Family Court's judgments.  Rather, Plaintiffs' suit seeks damages that resulted from the alleged misconduct of Adewundmi and CPS in the investigation of abuse and removal of JKG.  The <u>Rooker-Feldman</u> doctrine, thus, does not apply.

IV.     <u>Galario's Status as "Next Friend" of JKG</u>

The complaint is styled with Galario suing individually and as a "next friend" of JKG.  The state court granted Galario such status before the case was removed to federal district court.  (Mot. Ex. N.)  Defendants move that JKG should be removed as a party plaintiff or, in the alternative, to appoint a guardian ad litem for her because Galario no longer has legal custody of JKG.  (Mot. at 27.)

Defendants have provided this Court with no legal authority upon which this Court has the authority to reverse the state court's order or to appoint a guardian ad litem.  To that extent, Defendants have failed to meet their burden, as the moving party, to demonstrate a legal or factual basis for such action.  Accordingly, this Court DENIES Defendants' request without prejudice.

<u>CONCLUSION</u>

For the reasons stated above, the Court GRANTS IN PART AND

DENIES IN PART Defendants' motion for summary judgment.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, May 1, 2009.



_____
David Alan Ezra
United States District Judge

<u>Galario v. Adewundmi, et al.</u>, Civ. No. 07-00159 DAE-KSC; ORDER
GRANTING IN PART AND DENYING IN PART STATE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT